UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
DAISE E. WONG,

                    Plaintiff,

     —against—

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                    Defendant,
-----------------------------------------------------------------X

**MEMORANDUM AND ORDER**

CV-06-2949 (SLT)

**TOWNES, United States District Judge:**

Daise E. Wong ("Plaintiff"), brings this action under 42 U.S.C. § 405(g), seeking reversal of a final decision of the Commissioner of Social Security ("the Commissioner") that she was not eligible for disability insurance benefits ("DIB"), period of disability benefits ("POD"), or supplemental security income ("SSI") under the Social Security Act ("the Act") prior to March 26, 2003. Plaintiff asserted that she became disabled on October 19, 1998, due to a severe heart condition, which was diagnosed on April 1, 1999, as mild mitral valve stenosis, severe mitral valve regurgitation, and severe aortic valve regurgitation. The heart condition required a mitral valve replacement and aortic valve replacement surgery on April 2, 1999. Following the surgery, Plaintiff began to develop signs of anxiety and depression. The Commissioner found that Plaintiff was not under a disability prior to March 26, 2003, because she had the residual functional capacity for sedentary work, albeit in low stress environments due to her depression. The Commissioner found that as of March 26, 2003, however, Plaintiff's mental condition progressed and that she was "disabled" within the meaning of the Act. Based on these findings, the Commissioner found that Plaintiff was eligible for SSI payments since March 26, 2003, but not prior to this date. Plaintiff commenced this action on June 14, 2006, challenging the ALJ's

1

decision that she was not disabled before March 26, 2003. The Commissioner moved for judgment on the pleadings pursuant to Fed. R. Civ. Proc. 12(c) on April 2, 2007.

For the reasons set forth below, the Court remands this matter to the Commissioner to further develop the record.

## BACKGROUND

### I. Procedural History

Plaintiff was thirty-four years old when she applied for POD, DIB and SSI payments on March 22, 1999. Admin. R. ("A.R.") at 116-18. Plaintiff's application was denied on December 8, 1999. *Id.* at 60, 62-65. Plaintiff's request for reconsideration was denied on February 4, 2000. *Id.* at 66-70. Plaintiff then sought review before an Administrative Law Judge ("ALJ") and a hearing was held before ALJ Marilyn P. Hoppenfeld on September 21, 2000, with Plaintiff appearing *pro se*. *Id.* at 410-37. The ALJ considered the case *de novo*, and denied Plaintiff's application on February 12, 2001, finding that plaintiff was not under a disability. *Id.* at 82-96. Plaintiff requested Appeals Council review of the ALJ's decision, and the Appeals Council remanded this case back to the ALJ for further proceedings on January 3, 2003. *Id.* at 110-12. Plaintiff appeared with an attorney before ALJ Hoppenfeld on June 10, 2003. *Id.* at 438-84. At the time, the ALJ indicated that additional records were required and that upon receipt of those records the hearing would be continued. *Id.* at 481-82. A supplemental hearing was held on June 15, 2005, at which time Plaintiff again appeared with her attorney. *Id.* at 485-545. On December 12, 2005, the ALJ found that Plaintiff was not under a disability prior to March 26, 2003. *Id.* at 10-23. As a result, the ALJ found Plaintiff was not entitled to a POD or DIB because her date last insured was March 31, 2000. *Id.* at 22. Nevertheless, the ALJ found that the Plaintiff was eligible for SSI benefits as of April 2003. *Id.* at 23. The Appeals Council

denied Plaintiff's request for review on April 19, 2006, and the ALJ's opinion became the Commissioner's final decision. *Id.* at 4-6. This action followed.

## II. Medical History

*Physical Impairments*

Plaintiff had a history of heart problems, and testified at the initial ALJ hearing that she had "something like a heart attack" 18 years before in her native country of Ecuador. *Id.* at 429. Her condition was later diagnosed as a longstanding history of rheumatic fever and progressive dyspnea on exertion. *Id.* at 159. On April 1, 1999, Plaintiff was admitted to New York Hospital Cornell Medical Center ("Cornell") with mild mitral valve stenosis, severe mitral valve regurgitation, and severe aortic valve regurgitation. *Id.* at 169. A mitral valve replacement and an aortic valve replacement were performed on April 2, 1999, with no postoperative complications. As a result of the operation, the replacement valves created a metallic "ticking" sound. *See id.* at 164, 432. Plaintiff was discharged on April 8, 1999. *Id.* at 169.

On April 9, 1999, Dr. Alexander R. Green conducted a follow-up examination at Cornell. *Id.* at 203. Plaintiff complained of dizziness, chest and neck pain. Dr. Green opined that the dizziness was likely caused by a combination of deconditioning, Tylenol with codeine, and low blood pressure from Prinivil and Lasix. *Id.*

Dr. Nan-Ning Chang treated Plaintiff for her heart condition since September 14, 1995. *Id.* at 158. On April 20, 1999, Dr. Chang completed a medical report. *Id* at 158-62. Dr. Chang diagnosed Plaintiff with severe mitral regurgitation and aortic regurgitation status post valve replacement. *Id.* at 159. Plaintiff's symptoms were dyspnea on exertion and fatigue, which were expected to last for six months following the valve replacement surgery. *Id.* at 161. Dr. Chang

opined that Plaintiff could lift up to twenty pounds occasionally, stand or walk less than two hours a day, and sit without limitation. *Id.*

On July 16, 1999, Dr. Green sent Plaintiff for anti-coagulation treatment. *Id.* at 170-83. While hospitalized, Plaintiff complained of chest-tightness and dizziness, which were attributed to anxiety. *Id.* at 172. Plaintiff was discharged in stable condition on July 18, 1999. *Id.* at 201.

On October 27, 1999, Plaintiff was observed by Dr. Soo Park, a consultative examiner. *Id.* at 163-65. Dr. Park noted that Plaintiff complained of a headache, chest pains, and shortness of breath. *Id.* An EKG showed no evidence of left ventricular hypertrophy or ischemia and was "probably within normal limits." *Id.* at 164. Dr. Park confirmed the limitations of a mild degree of lifting, bending, walking, and standing. *Id.* at 165.

On November 21, 1999, Plaintiff was seen at the Cornell Emergency Department with complaints of shortness of breath and leg and thigh pain. Plaintiff was discharged the next day without dyspnea. *Id.* at 188-90.

On November 26, 1999, Dr. U. Weber, a state agency physician, reviewed the record and opined that Plaintiff's impairment did not meet or equal a listed impairment, and that she was capable of sedentary work. Dr. Weber noted that an echocardiogram would not add anything to this determination, and Plaintiff had only "mild" exertional limitations. *Id.* at 185.

On April 4, 2000, Plaintiff was again seen at the Cornell Emergency Department with complaints of arm and chest pain. *Id.* at 288-328. Plaintiff was discharged on April 6, 2000, and was instructed to avoid heavy lifting or strenuous activity. *Id.* at 319, 322, 325-26. The diagnoses upon discharge were costochondritis, status post mitral valve displacement, and status post rheumatic fever. *Id.* at 325.

On September 18, 2000, Dr. Uri Birnbaum, a consultative physician, examined Plaintiff. *Id.* at 216-17. Dr. Birnbaum found that Plaintiff's heart had a regular sinus rhythm with a grade 2 systolic murmur. A neurological examination and electrocardiogram were both normal. *Id.* at 217, 222. Dr. Birnbaum concluded that Plaintiff had not made a good recovery after surgery in terms of capacity for daily living or physical activity. He noted that the evidence did not indicate heart failure, but that plaintiff appeared to be severely depressed. He recommended limited physical activity, but stated that Plaintiff could do unlimited sedentary work. In a functional capacity assessment completed on September 19, 2000, Dr. Birnbaum opined that Plaintiff could lift or carry less than ten pounds occasionally, stand or walk for less than two hours a day, and sit for six hours a day. Plaintiff could never climb but could occasionally balance, kneel, crouch, and crawl. Plaintiff's ability to reach and handle was limited, and she should avoid exposure to temperature extremes, dust, humidity/wetness hazards, and fumes and other odors. *Id.* at 218-20.

On September 27, 2000, Dr. Green reported that an April 6, 2000, echocardiogram was normal and showed well-functioning mitral/aortic valves. *Id.* at 224. His diagnoses were valvular heart disease (mitral and aortic valve replacements), depression and chronic fatigue. Dr. Green found that Plaintiff tolerated the surgery well initially, but seemed to have more fatigue post-operatively. Dr. Green originally thought this was due to Plaintiff's heart readjusting to the new hemodynamics, but that this should not have continued for 17 months. Dr. Green found that Plaintiff had chronic and intermittent pains in her extremities and chest, from an unclear etiology, and chronic headaches. Dr. Green noted that Plaintiff's heart appeared to be in good shape, so that it was difficult to determine the cause of her symptoms, but that she may still be requalibrating to the new valves. Dr. Green also noted that Plaintiff's depression might be contributing to her physical conditions. *Id.* at 226.

On December 12, 2000, a summary from Cardiology Associates showed an abnormal EKG rate, atrial ectopy on a holter/event Monitor, an abnormal exercise test, and a heart murmur. Plaintiff's other findings were normal. *Id.* at 236-37.

On January 26, 2001, Dr. Jose R. Sanchez-Pena, the medical director at Comprehensive Medical Evaluations, P.C., reported that Plaintiff had been examined in his office since October 2000, for a history of mitral valve replacement. He opined that Plaintiff had persistent and severe progressive dyspnea since her surgery, and that this was totally disabling. He diagnosed Plaintiff with congestive heart failure, stage III and persistent mitral regurgitation. *Id.* at 107, 234, 243.

On July 16, 2003, Plaintiff was hospitalized at Cornell with chest pains until July 24, 2003. Dr. Elsie Morse, a consultative psychologist who examined Plaintiff on August 3, 2005, noted that Plaintiff reported a 2003 hospitalization for a heart attack and a mini-stroke. *Id.* at 403. Plaintiff also reported another surgery in 2005 for menorrhagia. *Id.*

*Mental Impairments*

On February 3, 2000, Plaintiff's medical records first establish signs of depression. *Id.* at 266. Dr. Green, on a follow-up visit related to Plaintiff's heart condition, noted that Plaintiff complained that she slept little at night, felt tired and was without motivation to do anything all day. Dr. Green indicated possible depression, but noted that Plaintiff was not interested in seeing a psychiatrist and starting medication for depression because she was already taking Coumadin for her heart condition. Dr. Green also recommended Plaintiff be reevaluated for counseling with a social worker. *Id.*

On May 8, 2000, Plaintiff received an initial evaluation at the Cornell Department of Psychiatry. *Id.* at 354-62. Plaintiff stated that she has felt more anxious and depressed since her

surgery because she was afraid she would die and that her heart could not withstand normal activity. Plaintiff also stated that she had intermittent thoughts of committing suicide. *Id.* at 354-55. Plaintiff received an initial treatment plan for outpatient psychopharmacology and psychotherapy, and was referred to a mental-health clinic. *Id.* at 361.

On May 18, 2000, Plaintiff began psychiatric treatment at Cornell with Richard Hawkins, a social worker, and Dr. Sharon Hird, a psychiatrist. Hawkins noted that Plaintiff could hear the mechanical valves in her heart clicking, and that she feared it would stop and that she would die. *Id.* at 363. Dr. Hird prescribed Paxil for depression, Notriptyline for pain, and Ambien for sleep. Plaintiff continued psychiatric treatment at Cornell through July 7, 2003. *Id.* at 363-74.

On September 26, 2000, Dr. Hird completed a mental functional capacity assessment. *Id.* at 227-29. Dr. Hird reported that Plaintiff had a good ability to make personal-social and occupational adjustments, except for a fair ability to deal with work related stresses. Plaintiff also had a good ability to understand, remember, and carry out detailed and simple job instructions, but only a fair ability to understand, remember and carry out complex job instructions. *Id.* at 228-29. Dr. Hird commented that plaintiff's history of depression was related to her cardiac condition and that she remained focused on her medical condition. *Id.* at 229.

On September 27, 2000, Hawkins noted in a therapy progress note that Plaintiff had applied for disability benefits. *Id.* at 366-67. Hawkins stated that both he and Dr. Hird felt that Plaintiff did not have a psychiatric disability, and that her depression and anxiety were the result of her worry about her cardiac condition. Hawkins also noted that Plaintiff was likely spending too much time at home worrying about her health, and he encouraged her to seek part-time work in order to regain her self-confidence and to live a more normal life. He opined that because Plaintiff saw herself as an "invalid", this would result in a "self-fulfilling prophecy." *Id.* When

Hawkins mentioned this to the Plaintiff, she became tearful and tried to persuade him that she was ill. *Id.* Hawkins also noted that he spoke with Dr. Green, who felt that many of Plaintiff's complaints about pain were psychosomatic. *Id.*

On November 17, 2000, Hawkins noted that Plaintiff was becoming more entrenched in a "sick role," and saw herself more as someone who should be on disability rather than working. *Id.* Plaintiff continued her medication and continued to see Hawkins without incident until September 12, 2002. During this time, Hawkins intermittently noted that Plaintiff showed signs of depression in some sessions, while in others she did not. *Id.* at 367-72. When Plaintiff did show signs of depression, this was often related to complications and worries about her heart condition. On January 12, 2001, for example, Hawkins reported that Plaintiff was not depressed. But on January 26, 2001, Hawkins stated that Plaintiff appeared depressed after she found out a valve in her heart was leaking, and Plaintiff worried greatly about her death. *Id.* at 368.

On September 12, 2002, Hawkins noted that one of Plaintiff's closest female friends had been murdered and that Plaintiff showed symptoms of depression consistent with grief. Hawkins also noted that Plaintiff had not come in for treatment in several months and that she was taking her medications erratically. Plaintiff did not return to treatment until March 26, 2003, when Hawkins reported that Plaintiff had a depressed mood, poor sleep and appetite, anxiety, and anhedonia. *Id.* at 373.

Plaintiff continued treatment with Hawkins through July 9, 2003. Plaintiff's condition improved and during that session, Hawkins noted that Plaintiff's signs of depression had dissipated. *Id.* at 373-74.

On June 15, 2005, Dr. Gettel, a psychiatrist, testified at the ALJ hearing as a medical expert. *Id.* at 512-22. Dr. Gettel stated that Plaintiff's treating sources had indicated she was not

eligible for benefits and that she should work. He also noted that her depression was not static and showed improvement with therapy. *Id.* at 514. Dr. Gettel opined that a recent move by the Plaintiff to Texas and back to New York had been a "catastrophe" on her psychological condition because "she hated [her life in] Texas." *Id.* at 514-515. Dr. Gettel opined that Plaintiff did not meet listing 12.07 for somatoform disorder. *Id.* at 519. Nevertheless, Dr. Gettel stated that he thought Plaintiff's condition as presently constituted met listing 12.04, but that he would wait until there was more medical evidence to make that determination. *Id.* at 520-22.

On August 3, 2005, Plaintiff was examined by Dr. Elsie Morse, a consultative psychologist. *Id.* at 403-06. According to Dr. Morse, Plaintiff reported normal sleep when she took medication and a normal appetite. *Id.* at 403. She also reported several depressive symptoms including dysphoric mood, psychomotor retardation, crying spells, guilt, loss of usual interest, irritability, and social withdrawal. *Id.* In response to whether she had suicidal thoughts, Plaintiff responded that she "just wants to sleep." *Id.* Plaintiff also complained of anxiety-related symptoms including excessive worry, nightmares, hyper startle response, restlessness, difficulty concentrating, and flashbacks. *Id.* at 403-04. She also maintained that she was afraid she would see dead people and claimed auditory hallucinations. *Id.* at 404.

Dr. Morse observed Plaintiff's thought process to be coherent and goal directed with no evidence of hallucinations, delusions, or paranoia. *Id.* Dr. Morse found her speech clear, cooperative, and oriented. *Id.* Dr. Morse found her affect depressed and her mood dysthmic. *Id.* She evaluated Plaintiff's memory skills as impaired, cognitive function average, insight poor, and judgment poor. *Id.* at 405. It was Dr. Morse's opinion that Plaintiff "can probably follow and understand simple directions and can perform simple tasks independently." *Id.* Nevertheless, Dr. Morse found that she "may not be able to maintain attention and concentration,

maintain a regular schedule, learn new tasks, perform complex tasks, make appropriate decisions, relate adequately with others, or appropriately deal with stress." *Id.* Dr. Morse diagnosed Plaintiff with major depressive disorder with psychotic features and generalized anxiety disorder. *Id.* She concluded that the "results of the examination appear to be consistent with psychiatric problems and this may significantly interfere with [Plaintiff's] ability to function on a daily basis." *Id.*

*Hearing Testimony*

Plaintiff testified that she came from Ecuador to the United States in 1987, and became a citizen in 1996. *Id.* at 419-20. She worked as a packer from 1988 through 1998, and also worked as a housekeeper from 1994 to 1995. *Id.* at 423-24. She left work in 1998 because she felt very fatigued. *Id.* at 424.

Plaintiff testified that she became depressed after the valve replacement surgery due to the "ticking" sound made by the replacement valves, which did not allow her to sleep. *Id.* at 432, 453. Plaintiff had to take medication to sleep, which would leave her feeling tired during the day. *Id.* at 432-33. Plaintiff testified that others around her could also hear the "ticking" noise made by the metallic valves. *Id.* at 474.

Plaintiff testified that she travelled to Ecuador to visit her aunt in 1998, 2000, 2001, 2002, and was unsure if she would again visit in 2003. *Id.* at 477-78. Plaintiff also testified that she moved from New York to Texas with the help of her brother, travelling by airplane. *Id.* at 500-02. She returned to New York in January, 2005, and left her possessions in Texas because she did not have the money to bring them back. *Id.* at 502, 504-05.

**III. ALJ's Decision**

On December 12, 2005, the ALJ issued her decision on Plaintiff's application. *Id.* at 23. She first concluded that Plaintiff was not engaged in substantial gainful activity since October 10, 1998, her alleged disability onset date. *Id.* at 15. Next, the ALJ found that Plaintiff's impairments, two mitral valve replacements, status post rheumatic fever, major depression, and alleged asthma; could be considered "severe" to satisfy the second step of the analysis. *Id.*

The ALJ then proceeded to the third step of the analysis—comparing the Plaintiff's impairment to the list of impairments in Appendix I to 20 C.F.R. Part 404, Subpart P ("the Appendix"). She determined that Plaintiff did not have an impairment or combination of impairments which met or equaled the criteria of any listed impairment in the Appendix. *Id.*

The ALJ concluded that prior to March 26, 2003, Plaintiff retained a residual functional capacity for sedentary work. *Id.* at 18. Plaintiff was, however, limited to low stress work due to her depression. Relying on the testimony of a vocational expert, the ALJ found that there were a significant number of low stress jobs locally and nationally that Plaintiff was capable of performing. *Id.*

The ALJ determined that after March 26, 2003, Plaintiff no longer had the capacity for work on a sustained basis in a competitive environment due to her mental limitations. *Id.* at 21. Plaintiff's occupational base was so significantly eroded that she could no longer perform her past relevant work and she could not make an adjustment to other work that existed in significant numbers in the national economy. *Id.* The determination that March 26, 2003 was the relevant date that Plaintiff no longer had the capacity for work was based on the August 3, 2005 evaluation by Dr. Morse. *Id.* The ALJ found that Plaintiff's mental condition progressed to the point where she was disabled as of March 26 due to the murder of one of her closest friends. *Id.* at 18.

# DISCUSSION

## I. Scope of Review

By statute, judicial review of a SSI determination is limited in that "[t]he findings of the Commissioner of Social Security as to any fact if supported by substantial evidence, shall be conclusive[.]" *See* 42 U.S.C. §§ 1383(c)(3) and 405(g). Thus, if the Commissioner's decision is supported by "substantial evidence" and there are no other legal or procedural deficiencies, then the decision must be affirmed. *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("In reviewing the final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.") Substantial evidence connotes "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389 (1971); *see also Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002). "In determining whether substantial evidence supports a finding of the Secretary, the court must not look at the supporting evidence in isolation, but must view it in light of other evidence in the record that might detract from such a finding, including any contradictory evidence and evidence from which conflicting inferences may be drawn." *Rivera v. Sullivan*, 771 F. Supp. 1339, 1351 (S.D.N.Y. 1991); *see also Veino*, 312 F.3d at 586 ("The district court's review of the Commissioner's decision regarding [the existence of a] disability is limited to a determination of whether the decision is supported by 'substantial evidence' in the record as a whole.").

The "substantial evidence" test applies only to the Commissioner's factual determinations; similar deference is not accorded to the Commissioner's legal conclusions or to the agency's compliance with applicable procedures mandated by statute or regulation. *See Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) ("This deferential ["substantial evidence"]

standard of review is inapplicable . . . to the Secretary's conclusions of law" and "[f]ailure to apply the correct legal standards is grounds for reversal.") Accordingly, the Commissioner's legal conclusions and compliance with applicable regulatory and statutory mandates are reviewed *de novo*.

## II. Legal Standard for Disability Determination

To qualify for either disability or SSI insurance, a claimant must be deemed "disabled" as the term is defined in 42 U.S.C. §§ 423(d)(1)(A), 1382c.[1] A person is "disabled" when "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C.A. §§ 423(d)(1)(A); 1382c(a)(3)(A). A person shall be deemed "disabled" and eligible for benefits "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003) (quoting 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B)). In determining whether a claimant is disabled under the Act, the Commissioner applies a five-step evaluation process. 20 C.F.R. § 404.1520. The process provides that:

> (1) if the claimant is gainfully employed then she will be found "not disabled;"
>
> (2) if the claimant suffers from a "severe" impairment, *i.e.*, one that significantly limits her physical or mental ability to do basic work activities, then the analysis proceeds to the third step;

---

[1] The guidelines for eligibility of disability insurance are codified in 42 U.S.C.A. § 423, while the guidelines for SSI are codified in § 1382.

13

(3) if the claimant's severe impairment meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix I, and has lasted or is expected to last for a continuous period of at least twelve months, then the claimant is disabled, if not, the analysis proceeds to the fourth step;

(4) if after determining the claimant's residual functional capacity, the claimant can perform past relevant work, she will not be found disabled; and

(5) if the claimant cannot perform any work she has done in the past, and the Commissioner determines that in conjunction with her residual functional capacity, age, education, and past work experience, she cannot engage in other substantial gainful work reasonably available in the national economy, she is disabled.

20 C.F.R. § 404.1520(a)(4).

The claimant bears the burden of proving her disabled status for the purposes of steps one through four. *See* 42 U.S.C. § 423(d)(5)(A). Nevertheless, "[a]t step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'" *Butts*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

In addition to the five-step analysis outlined in 20 C.F.R. § 404.1520, the Commissioner has promulgated additional regulations governing evaluations of the severity of mental impairments under 20 C.F.R. § 404.1520a. *Kohler v. Astrue*, 546 F.3d 260, 265-66 (2d Cir. 2008). These regulations require application of a "special technique" at the second and third steps of the five-step framework and at each level of administrative review. If the claimant has a medically determinable mental impairment, this technique requires the ALJ to "rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c)," 20 C.F.R. § 404.1520a(b)(2), which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of

decompensation. 20 C.F.R. §404.1520a(c)(3). *See Arguinzoni v. Atrue*, No. 08-CV-6356T, 2009 WL 1765252, at *8 (W.D.N.Y. 2009). According to the regulations, if the degree of limitation in each of the first three areas is rated "mild" or better, and no episodes of decompensation are identified, then the reviewing authority generally will conclude that the claimant's mental impairment is not "severe" and will deny benefits. § 404.1520a(d)(1). If the claimant's mental impairment is severe, the reviewing authority will first compare the relevant medical findings and the functional limitation ratings to the criteria of listed mental disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder. § 404.1520a(d)(2). If so, the claimant will be found to be disabled. If not, the reviewing authority will then assess the claimant's residual functional capacity. § 404.1520a(d)(3).

### III. Application of the Five-Step Analysis

#### a. Listed Impairment

The Court first turns to the Step Three of the disability analysis, whether the ALJ's determination that Plaintiff did not meet or equaled a listed impairment in the Appendix. In her decision, the ALJ held that Plaintiff did not meet Listing § 12.04 for Affective Disorders and § 12.07 for Somatoform Disorders. Plaintiff contends that this decision was not supported by substantial evidence and that the ALJ failed to consider Listing § 12.06 for Anxiety Related Disorder. Plaintiff maintains that the ALJ should have concluded at Step Three that she met or equaled one of these listed impairments, and ruled that Plaintiff was presumptively disabled rather than proceed to Step Four or Step Five of the analysis. The Court agrees that the ALJ's consideration of Listing § 12.04, Affective Disorders, which applies to impairments characterized by a disturbance of mood, accompanied by a full or partial manic or depressive

syndrome, was not supported by substantial evidence. *See* 20 C.F.R. Part 404, Subpart P, App. I, § 12.04.

Section 12.04 may be met by either satisfying the conditions in both Parts A and B of the provision or Part C by itself. Part A sets forth medical signs and symptoms of the impairment such as depressive syndrome, manic syndrome or bipolar syndrome. *Id.* Part B measures the impairment's functional limitations. *Id.* Under Part C, § 12.04 is met by a:

> Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
> 1. Repeated episodes of decompensation, each of extended duration; or
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

*Id.*

During the June 15, 2005 administrative hearing, the ALJ questioned the medical expert, Dr. Gettel, on whether Plaintiff met or equaled a listed impairment under § 12.04. A.R. at 519-22. Dr. Gettel responded, "I think we could get her on a 12.04, affective disorder." *Id.* at 520. Dr. Gettel reiterated that point when asked by the ALJ whether he could find § 12.04 "[b]ased on this record," "Yeah. I think we could do it." *Id.* The ALJ, Plaintiff and Dr. Gettel then engaged in a discussion of her symptoms under § 12.04. *Id.* at 520-21. At that point, the ALJ decided to send Plaintiff to a consultative expert in order to procure more information. *Id.* at 521. The ALJ stated that she did not want to ask Dr. Gettel to decide the case without medical evidence. *Id.* at 522.

On August 3, 2005, Plaintiff was examined by Dr. Elsie Morse, a consultative psychologist. Dr. Morse diagnosed Plaintiff with major depressive disorder with psychotic features and generalized anxiety disorder. *Id.* at 405. Dr. Morse opined that claimant may not be able to maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks, make appropriate decisions, relate adequately with others, or appropriately deal with stress. *Id.* She concluded that the "results of the examination appear to be consistent with psychiatric problems and this may significantly interfere with [Plaintiff's] ability to function on a daily basis." *Id.*

In light of the comments of the medical expert and the fact that the consultative psychologist's findings supporting a Listing impairment under § 12.04, the ALJ's conclusory conclusion that Plaintiff did not meet or equal a Listing is unsupported by the evidence. After acknowledging the need to procure further information with regard to § 12.04 and a consultative psychologist's report in the record supporting Plaintiff's case, the ALJ's simple ruling that "[a]fter review of the record and testimony of the medical expert at the hearing, and all of the recent medical evidence, it is concluded that the claimant does not and did not have an impairment or combination of impairments which met or equaled the criteria of any listed impairment," *id.* at 15, is insufficient. In addition, the ALJ failed to record specific findings on the severity of the mental impairment under 20 C.F.R. § 404.1520a. *See Kohler v. Astrue*, 546 F.3d 260, 266 (2d Cir. 2008) (remanding for failure to document 20 C.F.R. § 404.1520a findings).

Accordingly, the Court vacates the ALJ's decision and remands this matter for a determination of whether Plaintiff meets or equals a listed impairment and whether that impairment existed prior to March 26, 2003.

### b. Residual Functional Capacity

Plaintiff also challenges the ALJ's determination at Step Four that her residual functional capacity ("RFC") declined to a point of a disability based on her depression only after March 26, 2003. The ALJ found that prior to March 26, 2003, Plaintiff had a RFC for sedentary work and could sit for six hours in an eight hour day and stand and walk for two hours in an eight hour day and perform sedentary work. A.R. at 18. Nevertheless, the ALJ concluded, "as of March 26, 2003, the medical record demonstrated that her mental condition had progressed due to the murder of one of her closet female friends, who was murdered by her husband in an episode of domestic violence." *Id.* Plaintiff argues that medical evidence shows that her RFC would have shown a disability prior to the March 26, 2003 onset date. The Court concludes that the ALJ's RFC determination requires further explanation.

The Commissioner's regulations recognize that establishing the onset date of a disability will require "an informed judgment of the facts in the particular case," but emphasizes that "[t]his judgment, however, must have a legitimate medical basis." Social Security Ruling 83-20 1983 WL 31249. The ruling provides that the ALJ should call on a medical advisor to testify at the hearing in situations when onset must be inferred. *Id.* The ruling also requires the ALJ to provide a "convincing rationale" for the date selected. *See Talanker v. Barnhart*, 487 F.Supp.2d 149, 156 (E.D.N.Y. 2007).

The ALJ relied on the August 3, 2005, psychiatric evaluation by Dr. Morse, who diagnosed Plaintiff with major depression with psychotic features and generalized anxiety disorder, in determining that Plaintiff was disabled due to her mental condition. *Id.* at 19. The ALJ determined, longitudinally, that as of March 26, 2003, the medical record demonstrated that Plaintiff's mental condition progressed due to the murder of one of her closest friends. *Id.* at 18.

Prior to that date, the ALJ found that Plaintiff had not been compliant with treatment or medication because of a gap in treatment from September 12, 2002 until March 26, 2003.

Plaintiff's medical record, however, does not support such a determination. No medical opinion recognized March 26, 2003, as the date that Plaintiff's depression became so severe as to constitute a disability. Dr. Morse's psychiatric evaluation only leads to the inference that at least as of August 3, 2005, Plaintiff had become disabled due to her depression and anxiety. *Id.* at 403-406. The psychiatric evaluation contains no information that distinguishes March 26, 2003, as the relevant date that Plaintiff's condition progressed to such an extent as to render her disabled.

The only reference to March 26, 2003, in the medical records that could support the ALJ's determination is the patient records of social worker Richard Hawkins. On March 26, 2003, Hawkins noted that Plaintiff returned to treatment after an absence of several months, and that she had symptoms of depression, depressed mood, poor sleep and appetite, anxiety, and anhedonia. *Id.* at 373. According to Hawkins' patient record, however, Plaintiff visited the Cornell Medical Center on September 12, 2002, grieving from the murder. *Id.* at 372. This is the only reference to the murder of Plaintiff's friend in the medical record.

Accordingly, the Court also remands this matter to further develop the record in order to determine a convincing rationale for the date of onset of Plaintiff's disability.

## CONCLUSION

For the reasons set forth above, the Court vacates the Commissioner's final decision and remands this action to the Commissioner for further proceedings in accordance this opinion.

**SO ORDERED.**

_____
SANDRA L. TOWNES
United States District Judge

Dated: March 31, 2010
       Brooklyn, New York